Mr. Justice Hagner
delivered the opinion of the Court:
This is a bill in equity filed on the 12th of July, 1884, by Robeson and Niles, administrators of J. Wily Aulick, against Niles and Galt, executors of Mrs. Dykeman, and a number of charitable institutions which were residuary legatees under Mrs. Dykeman’s will. Mr. Niles objecting to remaining as co-complainant with Robeson as one of the administrators of Aulick, he was afterwards made a defendant instead. The object of the bill was the recovery of $10,000 which Robeson, as administrator, insisted was due to J. Wily Aulick for services as agent and attorney of his aunt, Mrs. Dykeman, in the management of her property for a period of seven and a half years next preceding her death.
As Mr. Niles would necessarily sustain the relation of plaintiff and defendant, the suit could not be brought at law.
Under a marriage settlement with her husband, Aulick was the trustee of Mrs. Dykeman; and he sustained that relation to her until 1874, when her husband died ; and the claim of the complainant is that Aulick from that time forth attended to Mrs. Dykeman’s affairs in the capacity of agent and attorney, and no longer as her trustee.
Answers were filed by the executors of Mrs. Dykeman, and by the residuary beneficiaries.
*185 Upon application by the executors of Mrs. Dykeman to dismiss the bill for multifariousness, the court below decided that the application of the complainant to.procure a construction of the will of Mrs. Dykeman, and a judgment as to the validity of the bequests, could not be properly joined with the claim for services; and the complainant was required to amend his bill by striking out as defendants all the beneficiaries who were residuary legatees. To the bill as thus amended, Niles and Galt, executors of Mrs. Dyke-man, then filed an answer. Afterwards, on application, they obtained leave to amend this answer, and made the amendment by interposing by way of answer the Statute of Limitations to the claim in tw’o forms: first, that the cause of action accrued more than three years before the filing of the bill; and, second, that the suit on the claim was not brought within nine months after it had been disputed and rejected by the executors of Mrs. Dykeman, as was required under section 18, subchapter 8 of the testamentary law of 1798, Oh. 101.
The complainant resisted the motion to amend; and afterwards moved to strike out these defenses, but his objections were overruled below.
It was urged here that we should, on this appeal, review the several orders of the court below authorizing this amendment of the answer, and allowing the defenses of limitation to stand, as well as the other interlocutory orders passed by the court below. But no appeal was taken from either of these orders when they were passed, and we are of opinion that we are not in a position now to review their correctness.
On final hearing1 the court below dismissed the bill upon the ground, as we are told, that the nine months’ plea of limitations was applicable to the case.
1. The first question to be considered is, whether Wily Aulick had a just claim for services as set up by the complainant.
*186 A large part of the testimony in the case upon the part of the complainant was given by Mr. Robeson, the plaintiff, one of the administrators of Wily Aulick. Of course his testimony under the evidence act (as construed in Page vs. Burnstine) would not be admissible as to any statement made to him by Aulick in support of his claim; although it would be competent with respect to his knowledge of the extent and value of Aulick’s services. But as the answer of Niles, his co-representative of Aulick’s estate, and coequal in authority in its administration, denies the rendition of such services, we have' preferred to omit Robeson’s testimony altogether from our consideration.
The other evidence on that subject, however, we think is ample to sustain the contention of the complainant, that valuable and continuous services were rendered by Wily Aulick as claimed, as agent and attorney of Mrs. Dykeman. Mr. Palmer, who describes himself as an intimate acquaintance of Wily Aulick and Mrs. Dykeman, testifies in the most satisfactory way on the subject; and from what he says there can be no doubt that Wily Aulick was attending assiduously to all the business affairs of Mrs. Dykeman during all the time referred to. As evincing his zeal in this service, two of the witnesses testify that when advised by his physician to leave for Europe for the benefit of his health, when suffering from illness, he refused to go, because, as he said, he could not leave the business affairs of his aunt, Mrs. .Dykeman.
Mrs. Dykeman possessed a valuable estate, consisting in part of a large number of shares in a gas company in Cincinnati, which were extremely valuable and yielded a large income. ' Another item of her property was a large amount, some forty odd thousand dollars, of United States stock. She had also two valuable houses, which required frequent repairs, as rented houses usually do; and all her matters of business of every description were attended to by Aulick, including the change of investments, collection of dividends *187 and rents, investment of surplus, receipts,- &c. For a long time before her death he was in the habit of attending also to such details of her businéss as drawing checks for her signature, but after her health became more impaired she gave him a power of attorney, ¿uthorizing him also to sign her name to checks on her bankers. In fact, he appears, according to this witness, to have been her universal agent.
Judge Aldis, a tenant of one of the houses, stated that Mrs. Dykeman was a lady unversed in business, who required somebody to attend to her business affairs; that she had selected Wily Aulick as her agent; and that he had business transactions with Aulick as such. To the same general effect is the testimony of Mr. Bliss.
Another of the witnesses, Bridget Corney, who for fifteen years was a personal attendant on Mrs. Dykeman, testifies that Mr. Aulick was indispensable to her; that she placed every reliance upon him, and that he was constantly doing everything for her that was needed.
Without further repetition of the evidence we content ourselves with stating as our conviction that the proof is ample that valuable services were rendered by Aulick, as claimed in the bill.
Various defenses were interposed by the defendants to the claim.
2. It is said, in the first place, that Aulick had been paid for whatever services he had rendered to Mrs. Dykeman by the permission, or option, given him of taking a number of additional shares of gas stock, which might be issued by the gas company, based upon the application by the company of part of its earnings to additional plant and improvements. These additional shares receivable by him at par, were salable at a higher rate, and the difference was his gain. This privilege he availed himself of in two instances and his profit, the executors insist, should be regarded as full compensation and discharge of the present claim.
*188 This option was given in 1874, as appears from the paper in evidence signed by Mrs. Dykeman. It is addressed to J. Wily Aulick, trustee for Mrs. Dykeman, and is in these words:
“In the event of the Cincinnati Gas Light and Coke Company issuing additional new stock, subsequent to this date, I authorize you to subscribe, for you own personal benefit and use, for such additional stock as may be issued to you as my trustee, providing you furnish the funds for the payment of the same.
“I also authorize you to sell the same for your own personal benefit and gain.
“ I intend this as a compensation for such services as you have heretofore rendered, and may hereafter render me, as my trustee, in the transaction of my business with the Cincinnati Gas Company.”
The original claim filed in the Orphans’ Court in April, 1883, was for $15,000 alleged to be due to Wily Aulick for services as trustee and attorney, but the present claim for $10,000 omits any charge for services as trustee. The services described in the option are only such as Aulick may have rendered and may thereafter render to Mrs. Dyke-man as her trustee, and were only for services “in the transaction of her business with the Cincinnati Gas Company,” while the present claim is for seven and a half years service rendered after 1874, as agent and attorney, and is not confined to services rendered in connection with the “business with the Cincinnati Gas Company,” but embraces Mrs. Dyke-man’s business of every description.
Among the papers filed in the case are several letters -from Mr. Niles to Mr. Robeson. All those which are offered by Mr. Niles in his own behalf are not admissible, under the impregnable rule that a party’s own declarations will not be received in evidence in his own favor.
One of these letters, however, was offered by the other side. In this Niles states to Robeson that when the will of *189 Mrs. Dykeman was in course of preparation, he called her attention to the amount of the legacy she proposed to give to Aulick, which.was only what she had provided for other nephews and neices, and suggested its increase, stating that Wily might think he had a special claim to more liberal provision, because of the services he had rendered to her; and that she replied she did not think he could make such a claim, because she had remunerated him for his services by the gift of the option for the gas stock, and for that reason he had no right to expect a larger legacy than that given to her other nephews.
But this conversation could not have occurred later than 1876, the time of the execution of. the will, and may have been considerably before that date; while almost .all the services here claimed for are alleged to have been rendered since 1876.- Again, the testimony of Bridget Corney is positive that Mrs. Dykeman told her she was willing Wily should charge for his services; that he had the right to charge her as other people would for attending to her business, and if he did charge her he should be paid. »
We think there is nothing in the case to sustain the objection that the services now sued for have been remunerated by the option on the gas stock.
3. It is next contended that all services rendered for Mrs. Dykeman by Mr. Aulick were performed by him in the expectation of receiving compensation by a special legacy larger than those given to other relatives, which was to be the only remuneration for his services.
There is no testimony at all supporting this contention, unless the statement of Mr. Niles already given could be considered as evidence; and conceding its admissibility, the supposed expectation on Aulick’s part would not in law prevent his prosecution of this claim.
We understand the law to be that the mere fact of the services having been performed in the expectation of receiving a legacy would not take away the plaintiff’s right of *190 action; and nothing short of an understanding between the parties would have such an effect. Chitty on Contracts, 591. Or, as expressed by Chief Justice Tyndall in Baxter vs. Gray, 3 M. & G., 770. “If the work and labor were performed under a hope of a legacy, I see no reason why the plaintiff should not on such hope failing him, be, as it were, remitted to his legal right.” Besides, according to Niles’ statement Mrs. Dykeman expressly denied that she had any thought of compensating Aulick by a legacy.
But although there is no testimony affirmatively tending to show that Aulick rendered these services in expectation of a legacy, yet there is strong evidence the other way. Paimer testifies that he knows Aulick always expected to claim compensation; and that up to three_ days before his death he actually made the claim; complained because he was put to trouble by Niles in being required to present it in form, and gave the particulars of his claim to his counsel to bring suit.
4. It is again asserted by Mr. Niles in one of his letters to Robeson that he knew Wily Aulick had -abandoned the claim. Mr. Niles was not examined as a witness, and this statement in his letter, produced by himself, is nbt admissible. But if we could consider it, we think it is entirely overcome by Palmer’s distinct evidence that up to within three days of his death Wily Aulick had no purpose of abandoning his claim.
5. The next point relied upon is the defense of limitations.
First, as to the nine months’ limitation. The language of the subsection is: “ If a claim be exhibited against an executor or administrator, which he shall think it his duty to dispute or reject, he may retain in his hands assets proportioned to the amount of the claim, etc.; and if on any claims exhibited and disputed as aforesaid, the creditor or claimant shall not, within nine months after such dispute or rejection, commence a suit for recovery, the said creditor *191 or claimant shall be forever barred; and the executor or administrator may plead this act in bar, together with the general issue, or other plea proper to bring the merits of the case to trial.”
This provision of the statute is one which upon principle should be strictly construed, since it is nothing less than an exceptional abbreviation of the general Statute of Limitations. If the creditor does not conform to this special requirement and bring suit within nine months after his claim has been presented and disputed, more. than two years shall be taken from the time allowed to creditors generally by the statute.
Under the authorities such restrictions should receive a construction almost penal in strictness. The decisions of the courts of New York upon similar provisions are to this effect. Hoyt vs. Bonnett, 50 N. Y., 543. And the Court of Appeals of Maryland has recognized the principle in its construction of this subsection of the statute.
In 9 Maryland, Peterson’s Executors, vs. Ellicott, 52, it appeared the plaintiff had sent his claim to the executors of Peterson, the defendants, by a friend with a demand for payment. They refused to pay, and “disputed” and “rejected” the claim; and more than nine months afterwards suit was brought. This provision of the statute was pleaded; and the court below decided that if the claim had been presented in the manner just stated, and Peterson’s executors then disputed and rejected it, and the suit was not commenced until the expiration of more than nine months thereafter, there could be no recovery. The Court of Appeals reversed the decision upon the ground that it did not appear affirmatively that the person who had presented the claim was the agent of the plaintiff. Recognizing that this provision of the statute was exceptional in character, and therefore to be strictly construed,"the court held that the subsection required the presentation of the claim should be made either by the plaintiff himself or by his agent for *192 that purpose authorized ; and upon this ground alone it declared the subsection inapplicable and refused to defeat the suit.
The first claim, as we have seen, was filed in the Orphans’ Court, and the present claim was first exhibited with the bill on the 12th of July, 1884; and never was presented to the executors of Mrs. Dykeman in its present form until the bill was filed. The amended answer of the executors, in which this subsection is .relied on, averred that on June 5, 1883, “the claim as.set forth in the original bill was exhibited against them, and by them on said day disputed and rejected, of which the plaintiff had notice.” But of course the claim thus referred to must have been the claim for $15,000, as the present claim was not filed for more than a year afterwards; and they could not, in June, 1883, have rejected a claim which was not filed until July, 1884.
Furthermore, the present claim never was proved by the administrators of Aulick as required by the testamentary acts, nor filed in the Orphans’ Court at any time.
In 53 Maryland, 367, Coburn vs. Harris, it was decided that the rejection of a claim, so as to meet the requirements of this subsection of the statute, must be of a claim which had been previously sworn to and presented to the administrator or passed by the Orphans’ Court. The court says: “Yet, unless so authenticated it is not in a form entitled to be paid; and therefore when Section 108 (which is this subsection in words) provides for the consequences which shall follow the rejection of a claim when exhibited against an administrator, it imports that the claim shall be exhibited in such form as that the administrator may be protected in paying it. The rejection or refusal to pay a claim not authenticated, is not such a refusal or rejection as is contemplated by the code, and imposes no obligation on the creditor to sue thereon within nine months. It stands as if it had never been exhibited.”
These are decisions upon this subsection by the courts of a State where the law was enacted ; and they are, in my *193 opinion, entitled to such peculiar weight that it seems unnecessary to look for decisions elsewhere.
As the claim before us was not presented to and rejected by the executors nine months before the filing of the bill, we think the special plea of limitations has no application to the case.
6. The next defense relied on is the three years’ bar of the Statute of Limitations ; and this we think is well taken. The complainant’s claim is within none of the exceptions of the statute; and if Aulick delayed a settlement with his aunt during all this long time, his own leniency or neglect has borne the usual fruit.
The complainant, however, insists the executors have waived the defense of*the three years’ bar of the statute; and he relies upon sundry letters written, by Niles as one of the executors, to Robeson, as administrator of Aulick, and to his counsel, as amounting to such waiver. These letters contain a great many declarations of Niles’ disposition to treat the demand throughout as an amicable claim, which * should be considered as a family controversy, and settled without a suit; and they certainly go far to evince an entire absence of any intention on the part of the executors to plead the Statute of Limitations. But we think they fall short of such an admission by them of an existing debt which they are willing to pay, as would be sufficient to dis-entitle the executors to interpose the statute as a defense, as they afterwards did in their amended answer.
Mrs. Dykeman died on the 23d of May, 1882, and this bill was filed on the 12th of July, 1884. The statute strictly applied, would exclude the recovery for any services rendered before the 12th of July, 1881; which would leave only about ten months’ services before her death unaffected by the bar. But in equity, where the defence of limitations as a general thing is said to be recognized upon principles of analogy, and the statute is regarded rather as one of presumption than of repose, the court will lay hold of any facts *194 in the case which would show it to be inequitable to apply the bar with the same rigor that would prevail in a court of law. Here the executors of Dykeman, having full discretion to withhold this defense, after discussion with Wily Aulick during the six months he survived Mrs. Dykeman, and repeated conferences with the complainant, as his administrator, for more than three years afterwards, determined in March, 1886, to interpose the plea of the statute in their amended answer to the claim which had been filed with the bill since July, 1884. During this interval the various letters of Mr. Niles, executor of Mrs. Dykeman, were written.
Robeson, in behalf of himself and Niles, as administrator of Aulick, having proved and filed in the Orphans’ Court, in June, 1883, the claim for $15,000, for services as trustee, as well as agent, afterwards withdrew it on the request of Niles. The letters were written with reference to this claim and request. The first we refer to, under date of December 29, 1883, is in this language:
“Hon. George M. Robeson:
“ Dear Mr. Robeson : See your counsel, Mr. Hackett, please, and request him to withdraw at once from the office of the Register of Wills the claim as sworn to by you against the estate of Mrs. Dykeman. The account is in every way irregular and in conflict with the facts as developed, and if it remains in the office it will do no possible good, and only be a cause of embarrassment in the settlement of our account. As your claim now stands, it is for a quantum meruit for services performed since the termination of the trust; and, if Mr. Hackett will prepare the same in regular form and submit it to Messrs. Blair and Meloy for arbitration the claim can be decided in a very short time, as the Children’s Hospital, of which I am the representative, will agree in whatever conclusion reached.
“ I now give you the same pledge, with the further assurance that the residuary interest in our hands, and which is *195 derived exclusively through the sale of real estate, and over which the Probate Court has no control, directly or indirectly, will be held by us subject to the final settlement of this claim. You, of course, can ask nothing more, as your case will not be in the slightest degree prejudiced by conforming to my request; and I, therefore, will regard it as a favor if you will have the account withdrawn at once.”
Again he writes, in January, 1884:
“ I desire to state that by conforming to my request the interest of the estate which you represent' will not in the slightest degree be prejudiced, as I have given you my pledge, and I now renew it, that the residuary funds now in the hands of the executors of the estate will be held by them until the matter of the payment of this account has been adjusted between the residuary legatees and yourself.”
There are several other letters to the same effect. When the defendants come into a court of equity and ask the court to apply the Statute of Limitations in their behalf, we think they should be made to do equity; and, inasmuch as the complainant, as we must assume, would at the time he received these assurances, have brought suit, except for this pledge, the intervening time ought not be reckoned against the claim ; and the statute should not operate further back than three years before December, 1883 ; that is from 29th December, 1880.
7. Next as to the amount that should be allowed. The estate of Mrs. Dyke'man amounted to about $200,000. It seems to be assumed that her income was at least $10,000, of which at least $6,000 was used annually in investment by Aulick as her agent.
It happens that during the latter part of her life, within the period not barred by the statute, and while this lady was practically unable to attend to any business, we have strong proof of the importance and value of Mr. Aulick’s services. Mr. Hyde, of Riggs & Co., testifies to a transaction in which Aulick sold some $38,000 of Government *196 stock which was about to be redeemed, at a good price, and the proceeds, with other funds probably derived from the surplus income, was invested in other bonds to the amount of $40,000. This was a transaction of very considerable importance and Hyde thinks was very judiciously conducted. The incident serves to illustrate the importance of Aujick’s duties as agent.
By the will of this lady, her brother was given $35,000; her nephew, J. Wily Aulick, $15,000; two other nephews, Francis Conover and Richard Conover, $15,000; each of her nieces, Rachel Baker and Helen Louise Morris, $15,000 each; and her grand-nieces, Julia M. Stout and Mary M. Stout, $10,000 each, and so on. None of these legatees ever moved a finger to manage any of this business, which was conducted all this time by Wily Aulick — the estate increasing year by year under his judicious management, which resulted in the accumulation of a large fund in which the residuary legatees may participate. The rendition of valuable services by Aulick is established to our entire satisfaction; and in view of the short time for which he can be allowed under the defense of limitations, we are disposed to give as large a sum annually as we can. Mr. Johnston testified that it was customary to pay an agent for the services he described (not embracing, as-we understand, various duties performed by Aulick), from $1,000 to $1,200 annually; and we have concluded that the larger sum per annum would be but fair remuneration for the services rendered by Aulick, to be computed from December 29, 1880, to May 23, 1882, the date of Mrs. Dykeman’s death.
The decree of the court below will be reversed and a decree signed directing the payment of this amount with interest from the last-named day.